Richards, J.
Shirley Bell was tried on an indictment charging manslaughter and was convicted and sentenced for that offense. He prosecutes error to this count, relying chiefly on errors claimed to have been committed by the trial court on a plea in abatement filed by him, and on errors in the charge of the court to the jury.
*187 The defendant had entered a plea of not guilty, but on leave of court was granted permission to withdraw that plea and file a motion to quash the indictment, and a plea in abatement, and he did in fact file the motion and the plea on February 20, 1917. The case was called for trial on March 6th and a jury impaneled. Immediately thereafter the motion to quash the indictment was, after consideration by the court, overruled. Thereupon the defendant stood mute and declined to enter a plea to the indictment; but the court entered a plea of not guilty for him, and the jury was again impaneled. After counsel had stated the case to the jury, and the witnesses had been called and sworn, counsel for the defendant inquired of the court what was done with the plea in abatement. The court replied that he simply ignored it. It is apparent from the record that the plea in abatement, which had been lost or mislaid, had at this time been found; but it was not disposed of by the court until after the rendition of a verdict of guilty of manslaughter. It was, however, heard and decided by the court before the motion for new trial was disposed of.
The first objection made by counsel for Bell is the error of the court in failing to decide the plea in abatement prior to the impaneling of the jury. Certainly the orderly administration of justice would require the court to dispose of such a plea prior to the commencement of the trial, but a failure of the court so to do would not justify a reversal of the judgment and sentence unless the action of the court in deferring a disposition of the plea in abatement were prejudicial to the de *188 fendant. It is manifest that the rules of criminal procedure should be so construed as to effect the purposes for which they are intended, and the test is not whether all the legal formulas have been literally complied with, but whether anything has been done or left undone which prejudices the substantial rights of the defendant. If the action of the court in delaying a hearing and decision on the plea in abatement prejudiced any substantial right of the accused a new trial should be had. If it . did not, then it is equally clear that it is the duty of an appellate court to decline to reverse the conviction on that ground. We are of the opinion that the action of the trial court in failing to hear and decide the plea in abatement until after the return of the verdict of guilty did not prejudice any substantial right of the accused. If the plea in abatement should have been sustained, die sustaining of it after the return of the verdict would have protected the rights of the accused; and if the plea in abatement should have been overruled, it could not prejudice the accused for the court to refrain from overruling it until after the return of the verdict.
The plea in abatement sets.forth in detail that one of the jurors serving 911 the grand jury which returned the indictment against the accused was Roger Sheehy, who was a native of Ireland and claimed by the defendant never to have been naturalized. On the hearing of the plea the record of the probate court was introduced in evidence, showing the action of that court on October 29, 1887, on the application of Roger Sheehy to be naturalized and to become a citizen of the United *189 States; but it was urged on behalf of the accused that the probate court was without jurisdiction under the federal statute in force at that time to grant naturalization papers to aliens, and that the record introduced in evidence was insufficient to show that Roger Sheehy was in fact naturalized by the action of that court.
The question raised as to the jurisdiction of probate courts in Ohio to naturalize aliens is an important one. The statute in force in 1887 giving jurisdiction to grant naturalization was Section 2165 of the Revised Statutes of the United States, and that statute provided, in substance, that an alien could declare on oath before a circuit or district court of the United States, or a district or supreme court of the territories, or a court of record of any of the states having common-law jurisdiction and a seal and clerk, etc., his intention to become a citizen of the United States. This statute was amended in 1906 so as to limit the jurisdiction of state courts in the granting of naturalization to those courts which have jurisdiction in actions at law or equity, in which the amount in controversy is unlimited. But the question of the naturalization of Roger Sheehy depends upon a construction of the statute as it existed in 1887. The limitation contained in the act governing the instant case is to those courts having common-law jurisdiction and a seal and a clerk. It is, of course, not necessary that the probate court should have had general common-law jurisdiction in order to be empowered to act in such cases, and such is the rule ánnounced in 2 Cyc., 112. That the probate court in Ohio is a *190 court of record is established by Section 7, Article IV, of the Constitution of Ohio. Under the statutes of Ohio the probate court has a seal; and by Section 1584, General Code, the probate judge is authorized to perform the duties of clerk of his court and may appoint a deputy clerk or clerks who shall take an oath of office before entering upon their duties, and who, when so qualified, may perform the duties pertaining to the office of clerk of the court.
The question of the power and authority of the probate courts of Ohio to grant naturalization to aliens has been under consideration in various courts, but, so far as we are aware, has not been determined by the supreme court of this state or the supreme court of the United States. The courts which have been called upon to decide the matter have not always been uniform in their holdings. The earliest decision which we have seen was rendered in 1858 in the probate court of Hamilton county, that court holding that probate courts in Ohio have power to admit aliens to citizenship. (Ex parte Downs, 3 Dec. Re., 47.) That decision, was, however, reversed in the district court of that county in In re Downs, 3 Dec. Re., 56.
In 1859 the subject was given careful consideration by the district court in Monroe county, in Ex parte Wingard, 2 Dec. Re., 126, and a decision was rendered by that court holding that probate courts in Ohio do have power to admit aliens to citizenship.
Shortly thereafter the identical question came on for hearing in the circuit court of the United States, in a case entitled Ex parte Smith, *191 3 O. F. D., 552, also reported 22 Federal Cases, 380. The circuit court of the United States in the opinion in that case delivered by Judge McLean held that the probate courts of Ohio have common-law jurisdiction in numerous instances, and a seal provided by law, and are empowered to employ deputy clerks and have jurisdiction to naturalize aliens. The rule thus announced by Judge McLean was the placing of a construction by a federal court on a federal statute, and the rule as thus laid down was 'followed generally throughout the state of Ohio until the amendment of the federal statute. The federal court gave critical' attention to the phraseology of the statute, construing the expression “having common law jurisdiction and a clerk and a seal,” and after such consideration reached the conclusion already stated. The case was cited in The People v. Pease, 30 Barb. (N. Y.), 588, 603, the court there saying that to hold that the court had no jurisdiction would be fruitful of mischief, creating doubts and uncertainty as to civil and personal rights, endangering titles to property, and in many instances, perhaps, destroying inheritances and changing the course of descent. The reasons thus given come now with added force, for when the decision just cited was rendered the court then had been exercising the authority for only ten years, whereas the authority has been exercised by the probate courts of Ohio for a century, in fact until the amendment of the federal statute in 1906.
In 1910 the jurisdiction of the probate courts to grant naturalization was before the court of common pleas of this county, (State v. Metzger and *192 Irish, 10 N. P., N. S., 97), and a decision was rendered by Judge Johnson, in which, after a thorough review of the authorities, the court reached the conclusion that such jurisdiction existed.
The surrogate’s court of New York has been held to have such jurisdiction. See Matter of Harstrom, 7 Abbott’s New Cases, 391.
On a review of all these cases, and especially in view of the holding of the United States circuit court cited above and followed in general practice for a half century and more, we are clearly of the opinion that the probate court of Lucas county had jurisdiction in 1887 to grant naturalization to aliens.
Counsel for Bell insist that even though the probate court had jurisdiction to grant naturalization to Roger Sheehy, the record introduced in evidence does not show that it did so. The record is certified under date of October 29, 1887, by J. W. Cummings, 'Probate Judge, by B. A. Case, Deputy Clerk, and recites, in substance, that at a probate court held at the probate office in the city of Toledo on October 29, 1887, Roger Sheehy, a native of Ireland, personally came and proved to the court that he had arrived in the United States before he had attained the eighteenth year of his age, and made the requisite declaration of his intention to be naturalized and become a citizen of the United States; and also proved to the satisfaction of the court that he had behaved as a man of good moral character, attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the *193 same. The record further recites that Sheehy, having fully complied with the laws of the United States in relation to the naturalization of aliens, on being admitted by the court, took-the oath to support the constitution of the United States of America and to renounce and abjure all allegiance and fidelity to every foreign prince, potentate, state or sovereign, and particularly to the queen of England. The record thereupon certifies that Roger Sheehy was admitted as a citizen of the United States. Attached to this record is a paper purporting to be an affidavit of Roger Sheehy, an applicant for naturalization; but it does not bear the signature of Roger Sheehy.
It is unnecessary to have perpetuated the evidence on which the probate court acted. It was a court of record, proceeding in a matter in rem over which it had jurisdiction, and its record imports absolute verity without setting forth the facts and evidence on which the judgment was rendered. (Shroyer, Guardian, v. Richmond et al., 16 Ohio St., 455.) Even though it were permissible to look to the affidavit made by Sheehy, for the purpose of determining the evidence on which the probate court acted, the absence of his signature to the affidavit is not sufficient to impeach the judgment of the court granting naturalization. The statute (Section 2165, Revised Statutes of' the United States) provides that the applicant shall “declare on oath,” and the record of the court shows that it was found by the court that he had complied with the statutes and was entitled to be naturalized, and the judgment ordered that he be admitted as' a citizen of the United States. While the judg *194 ment of the court is not perhaps technically regular in form, it can not be attacked in this collateral way. The judgments of courts in the granting of naturalization should be liberally construed, and we hold that the record introduced in evidence is sufficient to show that Roger Sheehy became a naturalized citizen of the United States in October, 1887, and was therefore qualified to sit on the grand jury which returned the indictment against the accused. It follows, therefore, that the trial court committed no error in overruling the plea in abatement.
On the trial of the case the evidence disclosed that the defendant on the date named in the indictment, to-wit, November 7, 1916, was driving a seven-passenger Hudson automobile north on Collingwood avenue in the city of Toledo. Ash-land avenue runs into Collingwood avenue from the southeast, and, at the point where these two avenues meet, the car driven by Bell collided with a car going south and driven by the deceased, Donald Fallon. As a result of this collision Fallon was killed. Bell himself took the stand and testified in his own behalf, and in the course of his testimony stated that he was driving his car at a rate of speed of from 18 to 20 miles an 'hour, which would be in violation , of Section 12604, General Code. The evidence, however, would justify the jury in finding that he was going at a very much higher rate of speed than testified to by him, some of the witnesses putting the speed at 40 miles an hour or more. The bill of exceptions contains photographs of the two cars taken shortly after the accident, and their condition as there shown *195 would indicate that they must have been proceeding at a very high speed at the time of the collision. Bell contended that he believed that Fallon, the deceased, was about to veer to the left onto Ashland avenue immediately before the collision, and that the collision was caused by the fact that Fallon changed his mind and determined to proceed down Collingwood avenue instead of going down Ashland as he had evidently first intended to do. He also claimed that the collision was caused by the high speed maintained by Fallon in driving his car, which Bell says was approximately 20 miles per hour. It is evident that the jury would have been perfectly justified in finding that if Bell had been operating his car within the speed authorized by the statute the collision could have been avoided easily.
Under this state of the record numerous requests to charge the jury were submitted by the defendant, which were refused, to which he excepted. Most of those requests are along the same line, and, if given, would have required the jury to find a verdict of not guilty unless they should find that a wilful violation of law by the defendant was the sole and only cause of the death of Donald Fallon. Substantially all of those requests were based upon the theory that if Fallon was guilty of any negligence that contributed directly to the collision, then the defendant could not be convicted. The court committed no error in refusing to give 'these instructions. If the defendant was guilty of a violation of Section 12604, General Code, in operating his automobile at a greater rate of speed than is permitted by that statute, and if *196 this conduct directly caused the death of Fallon, or was one of 'the causes which directly resulted in his death, then the jury would be justified in returning a verdict of guilty.
It is further insisted that the trial court erred in refusing to charge on the subject of assault and battery. If the defendant was operating the car at a greater speed, than was allowed by Section 12604, General Code, and if this resulted directly in the death of Donald Fallon, then the defendant was guilty of manslaughter. If the speed at which the defendant was operating the car was not in violation of that statute, or if it was not the direct cause, or one of the direct causes, of the death of Donald Fallon, then he was entitled to a verdict of not guilty. We see no reason why the trial judge should have been required to charge the jury on the subject of assault and battery. The case appears to be directly within the holding of the supreme court in State v. Vancak, 90 Ohio St., 211, 214, and State v. Schaeffer, 96 Ohio St., 215. The record discloses that Donald Fallon lost his life by reason of the unlawful conduct .of the accused in operating his machine at a speed in violation of the statute.
In a careful examination of the record we find no prejudicial error and the judgment will be affirmed. .

Judgment affirmed.

Chittenden and Kinkade, JJ., concur.